**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

RICHARD WAGNER,              :
                                         :
                                         :      **Case No. 2:16-CV-084**
           **Plaintiff,**              :
                                         :      **JUDGE ALGENON L. MARBLEY**
      **v.**                                :
                                         :      **Magistrate Judge Jolson**
AMERICAN UNITED LIFE INSURANCE   :
COMPANY,                                 :
                                         :
           **Defendant.**            :

## OPINION & ORDER

This dispute under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), is before the Court on the cross-motions for judgment on the administrative record of Plaintiff Richard Wagner ("Wagner") and Defendant American United Life Insurance Company ("AUL"). (Docs. 21, 24.) Wagner alleges that AUL wrongfully terminated his long-term disability benefits. Accordingly, he filed suit under 29 U.S.C. § 1132(a)(1)(B) to seek reinstatement of those benefits. For the reasons that follow, the Court **DENIES** Wagner's motion and **GRANTS** AUL's motion.

## I. BACKGROUND

In this case, Wagner seeks reinstatement of long-term disability benefits that he once received from AUL, and AUL seeks affirmation of their denial.

Wagner, now in his fifties, was rendered paraplegic in a motorcycle accident as a teenager. He completed high school and college, and worked for much of his adult life. Beginning in 1999, Wagner began working for Maxim Crane Works, LP ("Maxim Crane"), a company that rents out cranes and crane operators. (AR 9.) As an employee at Maxim Crane,

Wagner was a participant in the employee benefit plan that Maxim Crane established and maintained under ERISA for the purposes of paying, among other things, disability benefits. AUL is the insurer of the long-term disability benefits portion of the plan.

Under the insurance contract, AUL promises to pay a monthly amount to any participant satisfying the plan's definition of "disabled." The plan defines:

> Total Disability and Totally Disabled [to] mean that because of Injury or Sickness:
>
> > 1) the Person cannot perform the material and substantial duties of his regular occupation; and
> >
> > 2) after benefits have been paid for 36 months the Person cannot perform the material and substantial duties of any gainful occupation for which he is reasonably fitted by training, education or experience.

(Wagner Plan 000018.) The contract also contains an "elimination period" of 180 days, which is "a period of consecutive days of Disability for which no benefit is payable." (Wagner Plan 00010.) It deducts from any benefit amount SSD payments. (*Id.* at 12-13, 39.)

On May 28, 2011, while driving a Harley Davidson that had been modified to accommodate his disability, Wagner lost control of his bike, hit the curb, rolled over the sidewalk, and broke his right femur. (AR 28.) Wagner underwent surgery and surgeons placed a rod in his leg from his kneecap to his hip. He was in the hospital for 14-15 days.

At the time of the accident, Wagner had been working as a "Service Analyst," which necessitated frequent use of the computer, and use of the telephone, in tasks such as:

> "shop work planning compliance, daily schedule control, shop data analytics, step and shop procedural definitions, inspection step definitions for each make and model, step time standards, fluid sampling program administration, usage based standards, technical documentation library administration, access to paper manuals by make/model of crane, manufacturer online systems training, rigging control policies and shop information systems management."

(AR 533.)   The position was sedentary, involving "frequent sitting (affording adjustment/movement changes as needed), fingering, handling and reaching (desk level/arm's length) and up to occasional [ambulating,] and lifting/carrying/pushing/pulling up to 10 lbs." (AR 535.)

The plan administrator found the Material and Substantial Duties of Wagner's position to be the ability to:

- Confer with personnel of organizations units involved to analyze current operational procedures

- Identify problems and learn specific input and output requirements/forms/data input

- Write detailed description of user needs, program functions, and steps required to develop/modify program

- Review system capabilities, workflow, and scheduling limitations

- Determine if requested program or program change is possible within existing system

- Study existing information processing systems to evaluate effectiveness and develop[] new systems

- Prepare workflow charts and diagrams to specify in detail operations to be performed

- Conduct studies pertaining to development of new information systems to meet current and projected needs

- Plan and prepare[] technical reports, memoranda, and instructional manuals as documentation of program

- Upgrade[] system and correct[] errors to maintain system after implementation

- Record[] information, such as name, address, article to be repaired, or service to be rendered

- Prepare[] work order and distribute[] to service crew

- Schedule[] service call and dispatch[] service crew

- Call[] or write[] customer to ensure satisfactory performance of service

- Keep[] record of service calls and work orders

(AR 535.) Following the accident, Wagner did not return to work. He struggled with pain management, and he timely applied for long-term disability benefits ("LTD") in December 2011.

In a December 2011 phone call with AUL's stated claims administrator Disability RMS ("DRMS"), Wagner reported that he experienced pain that "comes and goes. There are pain flashes that feel[] like an ice pick in his thigh. Sometimes it happens for a second and sometimes when he is driving [he] needs to pull the car over b/c it lasts for 15 minutes." (*Id.*) Since the "pain was not going away . . ., he was transferred to a pain specialist who thinks it's all neurological pain." (*Id.*) He was prescribed "Oxycontin 5 mg during the day, nerve medication Gabapentin 800 mg at night and an Amitryptyline HCL 25 mg antidepressant. The antidepressant [wa]s supposed to enhance the nerve medication." (*Id.*) At the time of that call, Wagner reported that he "ha[d] not seen any success with those medications." (*Id.*)

On January 17, 2012, DRMS informed Wagner that his LTD claim was approved and that his benefits would commence on November 24, 2011. (AR 1051-52.) DRMS also informed Wagner that his claim

> w[ould] be evaluated on an ongoing basis to determine whether [he] remain[ed] eligible to receive [LTD] benefits. This review consists of a fair and objective review of all your medical and vocational information. This may consist of contacting your treating providers directly. We also may utilize the services of a vocational rehabilitation counselor who can provide you with information regarding our vocational rehabilitation program.

(*Id.* at 1051.) Wagner was also approved for Social Security Disability ("SSD") benefits, which, per the insurance contract, offset his LTD. In 2012, Wagner moved from California to Georgia to live with his parents. (*Id.* at 9.) He considered moving to Columbus, Ohio, where he has friends, but stayed in Georgia to help his parents following his father's Parkinson's diagnosis. (*Id.* at 9, 825.)

On May 30, 2013, Wagner's Primary Care Physician ("PCP"), Dr. Robert Sullivan, returned an Attending Physician's Statement to DRMS, indicating that he was treating Wagner for "Pain [management]." (*Id.* at 886.) Dr. Sullivan noted that Wagner suffered from "moderate limitation of functional capability: capable of clerical/administrative (sedentary) activity (60-70%)." (*Id.* at 887.) In the "Mental/nervous impairment section, he noted that Wagner was "able to function under stress and able to engage in interpersonal relations (No limitations)." (*Id.*)

On June 18, 2013, Wagner reported changes in his medications, attempting to decrease the amount of grogginess-inducing pain medications, and stabbing pain, more so on "bad days." (AR 13.) He mentioned that he does some fishing and other activities that last for a few hours. He sometimes rides along with his friend who races cars, or attends a baseball game or swap meet. He reported "that he is good for a couple of hours and then after 4-5 hours the pain flares up and he needs to take an Oxy[C]ontin." (*Id.*)

On June 20, 2013, DRMS asked Dr. Sullivan whether he believed that Wagner could work full-time at a sedentary level. (AR 865.) Dr. Sullivan checked the "no" box, and circled "lift, carry, push, pull, or move objects" and "walking or standing for brief period" associated with the "sedentary level work" definition provided on the questionnaire. (*Id.*) He also noted, "By your definition, pt may need to 'walk or stand.' This is impossible with pt's disability. Patient is not capable of 'lift, carry, push or pull[.]" (AR 866.)

Dr. Sullivan noted on June 28, 2013 that Wagner was attempting to wean off of fatigue-inducing medications. The plan was to "try to find a balance between oversedation and pain control." (AR 726.) Upon contact from the disability insurer and receipt of a job description including a requirement for 'standing and walking short periods, lifting and pushing up to 10

pounds on a regular basis," Dr. Sullivan stated that "[t]his patient is in a wheelchair, he is totally incapable of supporting his own weight, I doubt he is capable of routinely pushing weights 10 points. It certainly possible he could work primarily with the keyboard and telephone but by the definition and job description sent to me he is not employable." (*Id.*)

On July 12, 2013, DRMS again asked Dr. Sullivan whether he believed that Wagner could work full-time at a sedentary level. (AR 859.) Dr. Sullivan responded, "I would refer 'arms-length' evaluation from a disability specialist as I have <u>no</u> experience." (AR 860.) There was no description of "sedentary level work" in this questionnaire.

On August 1, 2013, Wagner reported that "[h]e feels as if he were working sitting at a desk he would lose concentration after about 4 hours. He said the pain gradually increase[s] the longer he sits still. He said he would like to try a part time job at a Home Depot type store as he would be moving around and he feels better when doing so." (AR 9.) He reported having good upper body strength such that he "flips his wheelchair in the car after transferring himself." (*Id.*)

On September 3 and 9, 2013, Rehabilitation Case Manager Susan B. Guilbeau, MS, CRC visited Wagner at his parents' home and at Dr. Sullivan's office. (AR 825.) Guilbeau spent a total of approximately three hours and forty five minutes with Wagner. She noted that Wagner:

> frequently winced (with his entire body, including face tensing up) from frequent pain flashes he was experiencing in his right thigh. At the same time, he would grab his right thigh and rub it until the flashes of pain subsided. Mr. Wagner would actually stop talking involuntarily when these twitches of pain occurred. Mr. Wagner describes this pain as a severe stabbing, ice pick like pain which ranges from 8-10 out of 10, each time it happens.
>
> He states this happens multiple times every few minutes and lasts anywhere from a few seconds to as long as up to a minute at a time. This also occurs throughout the night as well, which disrupts his sleep and causes him to be groggy all day.

(AR 826-27.) She spoke with Dr. Sullivan regarding Wagner's ability to return to work. Dr. Sullivan "was very leery about stating what Mr. Wagner could do or not do" and preferred to

refer Guilbeau to a specialist.  (AR 828.)  When pressed, Dr. Sullivan stated that "there was no medical reason to preclude" Wagner from "working part-time at a job such as at Home Depot." (*Id.*)  Wagner reported waking up usually around 8-9:00 a.m., having a cup of coffee, letting his dog out, eating breakfast, taking his dog around the pond near his parents' house, running errands, and going to appointments.  He reported waking up slowly due to the pain in his right thigh.   He also enjoyed fishing, tinkering with engines including a 1969 Mustang, exercising with a hand cycle, going to car shows, and "actually does a little sports car driving."  (*Id.* at 829.) He reported spending most of his time in a wheelchair, but also spent time in a recliner, driving, or in bed.  He reported being able to lift 20-30 lbs.  (*Id.*)

> Guilbeau concluded that Mr. Wagner:
>
> does seem capable of working a part-time, sedentary position where he may have flexible hours such as a Retail/Customer Service position at Home Depot.  Given his grogginess in the morning and somewhat throughout the day, this would allow him to try to go for shifts which would be sometime in the afternoon to the early evening. . . .
>
> Based on my assessment of Mr. Wagner, it is my opinion he is not capable of full-time employment at this time, mainly due to the severe frequent twitches he experiences throughout the day and night and the lack of sleep this same twitching causes, causing him to be groggy throughout the day.

(*Id.* at 833.)  Guilbeau suggested that "[s]ince Dr. Sullivan seemed slightly overwhelmed with answering some of the questions in regard to Mr. Wagner's basic medical concerns, it may be worth considering transferring him to a different doctor."  (AR 832.)

On September 24, 2013, Wagner reported sleeping better with Ambien, planning to apply for a job at Home Depot, and bidding on a house in Columbus, Ohio.  He took multiple trips to Ohio to house-sit (in Cleveland), buy a house, and oversee renovations.  (AR 6, 735.)

On July 2, 2014, Nurse Joyce Berthiaume (a medical consultant for DRMS) reviewed Wagner's medical records and noted that Wagner:

reports chronic pain impacts function and prevents his return to sustaining a sedentary level of activity. The medical records do not fully support this and functional capacity remains unclear, indeed, Dr[.] Sullivan is hesitant to say whether [Wagner] could perform full time sedentary work. The certified rehabilitation counselor's [(Guilbeau's)] opinion noted above is outside her area of expertise and thus not credible.

(AR 698.) She recommended "consideration of performing a more extensive social media search and direct observation of activities[.]" (*Id.* at 699.)

This direct observation of activities occurred on August 3, 2014, with a surveillance video.[1] (AR 540-46.) On this day, Wagner drove from his home to a coffee shop, and to Columbus's Park of Roses with his dog. The video showed him driving and walking his dog, although it does not show him transitioning to and from his car and wheelchair. Wagner remained seated in his wheelchair for more than two hours, powered the wheelchair with his arms, and controlled his dog. He smiled and engaged socially with others in the park. He appeared at ease, exhibiting no signs of twitching, grimacing in pain, position-shifting, grogginess, or restlessness.

On August 18, 2014, Dr. Sullivan returned an additional Attending Physician's Statement to DRMS, indicating treatment for pain management and edema. Dr. Sullivan noted that Wagner could complete "activity as tolerated," had a physical impairment preventing him from sedentary work (with part of the "sedentary" description requiring "walking/standing on occasion" circled and X'd out), and had no mental/nervous impairment/restrictions. (AR 551-52.) In the "Remarks" section, Dr. Sullivan noted that Wagner was in a wheelchair and "unable to support weight[.] Light clerical work only if able to take frequent breaks (every 15 minutes) to adjust weight, bladder needs, etc. 0 lifting." (*Id.* at 552.)

---

[1] Surveillance on July 16, 2014, yielded nothing, because Wagner was out of town, driving from Georgia to Ohio. Wagner was also not observed during attempted surveillance on August 2, 2014. (AR 540.) The Court reviewed the August 3, 2014 video, which was filed manually with the Court.

On August 20, 2014, Wagner reported living in Ohio, but driving himself to and from Georgia/Ohio. He noted that his condition was stable, and that it is the "same old headache that it has always been." (AR 4.) He mentioned "pain in his leg mostly in the AM." (*Id.*) He noted that he does all of his chores and shopping (albeit slowly), and that on a typical day he takes his dog for a 30-60 minute walk in the park or watches a friend play softball, and then goes to the store for an hour. He mentioned sleep as a continuing issue, and that he wakes up to 4 times per night. He was not seeking employment at that time, and had no changes to his income or SSD. He thought about doing some volunteer work, and planned on spending four hours at the library during the upcoming week to help in this endeavor.

On August 21, 2014, Nurse Berthiaume watched the surveillance video and noted that Wagner's "observed and reported level of activity appears inconsistent with total impairment." (AR 3.) She wrote to Dr. Sullivan, enclosing the surveillance video and the describing Wagner's activities he recounted on August 20, 2014, and asked whether Dr. Sullivan believed that Wagner "currently has the functional capacity to perform sedentary level activities on a full time basis[.]" (AR 539.) Dr. Sullivan returned the form on September 5, 2014, placing a check-mark next to the word "No" but did not explain his rationale or provide any supporting documentation as requested. (*Id.*) There was no description of "sedentary level work" in the questionnaire.

On September 16, 2014, Teresa Marques, a vocational consultant, conducted an "Own Occupation Assessment." (AR 532-35.) She noted Wagner's history, medical treatment, and statements from Dr. Sullivan, compared with the physical demands of his prior job, and concluded that "[t]he sedentary physical demands of the combined Systems Analyst and Service Clerk occupation are consistent with Mr. Wagner's full time sedentary physical capacities, affording a couple of minutes (mini breaks) every 30 minutes." (AR 532.)

On September 18, 2014, DRMS sent Wagner a letter stating that he is "no longer disabled from [his] own occupation." (AR 522.) This letter detailed the evidence relied upon, including much of the above. The letter noted, among other things, "Mr. Wagner, it appears any discomfort you may have is well controlled by the current level of treatment you are receiving through Dr. Sullivan; otherwise we would have expected changes in medications and/or referrals to specialists for better control of pain." (AR 524.) DRMS discontinued Wagner's benefits as of September 24, 2014. (*Id.*) Wagner appealed this decision and, in addition to Dr. Sullivan, sought the support of Dr. Hale, a neurologist, and Dr. Keomahathai, a pain specialist.

On September 21, 2014, Dr. Sullivan sent DRMS another Attending Physician's Statement, stating that Wagner was "restless" in addition to paraplegic and suffering from chronic pain. (AR 411-12.) In a dramatic shift from his prior statements, Dr. Sullivan described Wagner as "unable to sit still for more than 3-5 minutes," and with a physical impairment rendering unable to perform *any* hours of *any* activity level, including sedentary. (AR 412.) He also noted a much different mental/nervous impairment than his prior statements, rating Wagner at a "Moderate limitation," meaning "Patient able to engage in only limited stress situations and engage in limited interpersonal relations." (*Id.*) In the "Remarks" section, Dr. Sullivan noted that Wagner was wheelchair-confined, and that his chronic restlessness requires almost constant body shifting. He also indicated that Wagner's medication causes some impairment of his mental alertness. (*Id.*)

On December 18, 2014, Dr. Hale, Wagner's neurologist, submitted an Attending Physician's Statement noting that Wagner could not stand/ambulate, that his physical impairment allowed him to perform sedentary activity, and that he had no mental/nervous impairment. (AR 409-410.)

On January 12, 2015, Dr. Keomahathai, a pain specialist, completed an Attending Physician's Statement assessing Wagner's restrictions at an inability to walk or lift. (AR 214.) Dr. Keomahathai opined that Wagner could not work in any capacity and that he had moderate mental/nervous impairments. (AR 215.) He noted that Wagner is "very restless and has frequent position shifting. Some impairment to cognizance due to chronic narcotic use for chronic pain." (*Id.*) Dr. Keomahathai also saw Wagner on March 6, 2015. (AR 167.) After determining that Wagner was not a suitable candidate for spinal stimulation therapy and hearing from Wagner that he had no "untoward side effect of his meds," Dr. Keomahathai's "understanding is now that his primary care provider will maintain his medication[.]" (*Id.*)

On May 18, 2015, Dr. Hale responded to a letter from DRMS agreeing that "Mr. Wagner is not precluded from performing full-time sedentary work including exerting up to 10 pounds of force occasionally, with constant sitting in his wheelchair." (AR 157-58.) Wagner contends that this particular check-mark was made in error, and points to a November 25, 2015 letter from his attorney explaining as much, and attaching an Attending Physician's Statement from Dr. Hale dated September 2, 2015. (AR 82-84.) *This* Attending Physician's Statement suggests that Wagner cannot perform even sedentary work, and rates his cognitive impairment as "moderate." (AR 83-84.)

On June 8, 2015, Dr. Russell, Board Certified in Occupational Medicine and apparently a DRMS employee, reviewed Mr. Wagner's medical records and concluded that he "was not precluded from sedentary work in a wheelchair." (AR 150-51.) He did note that "[t]wo providers continue to support impairment due to restlessness requiring frequent repositioning." (AR 151.) However, he opined that:

> [t]his appears to be a choice on the insured's part, as he had no evidence of this on video surveillance. The insured worked in a sedentary occupation for many years

while wheelchair-bound.  He reports that pain precludes him from this level of activity.  This is inconsistent with a person who lives alone, drives extensive distances, volunteers, fishes, and pushes his wheelchair on walks with his dog.

(*Id.*)  Dr. Russell noted, too, that "[t]here is no evidence in the file that the insured has cognitive deficits from his medications.  Pain management records specifically state he has no side effects of his medications."  (*Id.*)

On June 10, 2015, DRMS sent Wagner a letter informing him that his appeal had been denied.  (AR 145-149.)  This letter cited various records, including Dr. Russell's report, and refuted Wagner's claim of cognitive deficits with the statement that:

there is no mention of you needing help taking your medications, remembering to pay bills, losing your way while driving, or possessing less than appropriate executive function.  Your appeal letters were noted to be cogent, informative, and well written.  On observation, you appeared to be conversing with multiple persons at the park, you did not exhibit pain behavior, shifting positions, and you were able to drive yourself, eat lunch and take your dog for a long walk.

(AR 146.)

Wagner appealed a second time on August 27, 2015.  (AR 139.)  On September 2, 2015, Dr. Hale submitted the Attending Physician's Statement (AR 83), previously described, indicating both physical and mental impairment.  On September 15, 2015, Dr. Sullivan also submitted another Attending Physician's Statement opining that Wagner's physical impairment prevents him from even sedentary activity (which was described as "10 lbs. maximum lifting or carrying articles.  Walking/standing on occasion.  Sitting 8 to 8 hours."  Dr. Sullivan circled "Walking/standing").  He again opined that Wagner suffered from moderate mental/nervous impairment.  (AR 86.)  In the "Remarks" section, Dr. Sullivan stated that:

Pt is unable to maintain body position or concentration for more than 30 minutes due to pain.  Pt mentation is impaired due to medication and poor sleep.  Pt has episodes of incontinence.  I do recommend Pt get physical activity when possible for physical and emotional benefit.  He should utilize wheelchair . . . for some physical activity as tolerated.

(AR 86.)  Dr. Sullivan submitted an additional Attending Physician's Statement dated September 25, noting "chronic restlessness requires almost constant body shifting.  Medication causes some impairment mental alertness."  (AR 412.)

On October 19, 2015, Wagner obtained the opinion of Bruce Growick, Ph.D., a Psychologist and Vocational Expert, that he is "currently unable from [sic] performing sustained remunerative employment in any work field."  (AR 99-101.)  In reaching this conclusion, Dr. Growick reviewed "the medical reviews of Drs. Hale, Sullivan, Pandya [(a sleep specialist determining that Wagner has severe sleep apnea)] and Keomahathai; the Vocational Disability Report of Ms. Guilbeau; and finally, the denial letter of Disability RMS dated June 10 of 2015."  (AR 99.)  He found a preponderance of this medical evidence to support his conclusion that Wagner is unable to work in any capacity.  DRMS requested that Dr. Growick review additional evidence, including the report of Dr. Russell, and was rebuffed by Wagner's attorney, who nevertheless offered to submit Wagner to an in-person medical evaluation.  (AR 95.)

On November 30, 2015, DRMS denied Wagner's second appeal, but Wagner had mailed additional information on November 25, 2015, including the September 2, 2015 Attending Physician's Report from Dr. Hale, the September 15, 2015 Attending Physician's Report from Dr. Sullivan, and the report of Dr. Growick, among other records.  (AR 72-73, 82.)  DRMS asked Dr. Russell to complete another file review of these records.  (AR 78-79.)  He did so, and maintained the same conclusion—that Wagner was able to perform sedentary work from his wheelchair—observing, with relation to cognitive deficits noted in later doctor's reports:

> There is no evidence of neuropsychological testing, mini-mental status exams, Montreal Cognitive Assessment, or even examples in his physician notes describing these deficits.  As I previously stated, there is no mention of his being unable to take his medication, pay his bills, loses [sic] his way driving, or possessing less than appropriate executive function.  His appeal letters are cogent, informative, and well written.

(AR 79.)  He stated that no in-person medical evaluation was required "as this could not address his condition in 2014."  (*Id.*)  He dismissed Dr. Growick's assessment because "the opinion appears to be based solely on the opinions other physicians have provided."  (*Id.*)  DRMS sent Wagner a third denial letter on December 22, 2015.  (AR 74-75.)

## II.  STANDARD OF REVIEW

This Court reviews an ERISA plan administrator's termination of benefits *de novo* "unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits."  *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009).  If the benefit plan gives the administrator discretionary authority to determine eligibility for benefits, the Court reviews the administrator's decision under the highly deferential "arbitrary and capricious" standard of review.  *Id.*

The parties disagree over whether the plan grants discretionary authority to the administrator so as to trigger arbitrary and capricious review.  While such authority need not be granted with "the word 'discretion' or any other 'magic word,'" *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998), it must be a "*clear* grant of discretion."  *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801 (6th Cir. 2002) (emphasis in original) (internal quotations omitted).

Assuming, for the purposes of argument, that the plan grants discretion to AUL, it does not give a *clear* grant of discretion to DRMS, the entity that held itself out to Wagner as the administrator for the plan.  (*Compare* AR 513 ("Disability RMS is the claims administrator for [AUL] group disability insurance products including the group's disability insurance policy issued to Maxim Crane Works, LP"), *with* Wagner Plan 90 ("The plan is administered by: Maxim Crane Works").)  AUL has not identified any plan provisions mentioning DRMS, and

has not identified any plan provisions granting authority to delegate plan administration, to DRMS or to anyone else. (*See* Doc. 24-1 at 14; Doc. 26 at 2.) Because there was no "*clear grant of discretion*" to DRMS, the Court reviews the administrator's decision *de novo*. *Javery v. Lucent Tech. Inc. Long-Term Disability Plan for Mgmt. or LBA Emp.*, No. 2:09–cv–00008, 2011 WL 883017, at *2 (S.D. Ohio Mar. 10, 2011), *rev'd on other grounds*, 741 F.3d 686 (6th Cir. 2014) (reviewing administrator's decision *de novo* where plan does not present a clear delegation to entity holding itself out as claims administrator).

In the ERISA context, a Court's *de novo* review of "a denial of benefits 'is to determine whether the administrator ... made a correct decision.'" *Hoover*, 290 F.3d at 808-09. In making this determination, the Court limits its review "to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.* at 809. The Court affords the administrator "no deference or presumption of correctness." *Id.*

## III. ANALYSIS

For Wagner "[t]o succeed in his claim for disability benefits under ERISA, [he] must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the Plan. *Javery*, 741 F.3d at 700–01.

The plan defines disability to mean that, "because of Injury or Sickness:

> 1) the Person cannot perform the material and substantial duties of his regular occupation; and
>
> 2) after benefits have been paid for 36 months the Person cannot perform the material and substantial duties of any gainful occupation for which he is reasonably fitted by training, education or experience.

(Wagner Plan 000018.) Because Wagner's benefits were terminated prior to the 36-month "regular occupation" cutoff, the Court will, as did the various doctors and reviewers, limit its analysis to whether Wagner could perform his "regular occupation" at that time.

The plan administrator (and the Court on its *de novo* review of the administrative record) is "not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Nor must the administrator "accord them controlling weight." *Temponeras v. United States Life Ins. Co. of Am.*, 185 F.Supp.3d 1010, 1019–20 (S.D. Ohio 2016). Nor does ERISA "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id.*, citing *Black & Decker*, 538 U.S. at 831. Of course, the administrator also "may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Id.*, citing *Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006). But "a lack of objective medical evidence upon which to base a treating physician's opinion has been held sufficient reason for an administrator's choice not to credit that opinion." *Curry v. Eaton Corp.*, 400 F. App'x 51, 59 (6th Cir. 2010) ("ERISA and federal regulations . . . do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition."). *See also Huffaker v. Metropolitan Life Ins. Co.*, 271 F. App'x 493, 501 (6th Cir. 2008) ("MetLife did not arbitrarily refuse to credit Dr. Bozeman's findings given the inconsistency between Huffaker's subjective complaints of pain and Dr. Bozeman's findings of normal muscle strength and range of motion.").

Moreover, there is "nothing inherently objectionable" about a benefits defendant's decision to conduct only a "file review by a qualified physician in the context of a benefits decision" rather than an in-person evaluation. *Bennett v. Kemper Nat. Services, Inc.*, 514 F.3d

547, 554–55 (6th Cir. 2008) (internal quotation omitted). On the other hand, if the plan gives the administrator the right to conduct a physical examination, and the administrator does not exercise this right, this failure "raise[s] questions about the thoroughness and accuracy of the benefits determination." *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015) (internal quotation omitted). The failure to conduct a physical examination is "especially troubling" when a plan's advisors make credibility determinations and second-guess treating physicians. *Id.*, citing *Judge v. Metro. Life Ins. Co.,* 710 F.3d 651, 663 (6th Cir. 2013) (the plan second-guessed treating physicians when it "credited the assumption of the transferrable-skills analysis that 'Mr. Shaw can perform sedentary work' over Dr. Reincke's conclusion that Shaw could not sit for more than 30 minutes at a time" and made credibility determinations when it "discounted Dr. Reincke's medical records because they were 'based solely on Shaw's own subjective complaints of pain.'").

Courts have credited file reviews that point out inconsistencies within the record, however, rather than make credibility determinations. *Nichols v. Unum Life Ins. Co. of America*, 192 F. App'x 498, 504 (6th Cir. 2006) ("However, [the file reviewer] also concluded that inconsistencies within the medical records did not support a finding of other impairments complained of by Nichols, including severe diarrhea, hypercoagulation, functional and/or cognitive impairment, or fibromyalgia. Hence, [his] review of the medical analyses supported [the vocational] conclusion that Nichols was not so physically restricted and limited that she could not continue to perform some variation of her former occupation with reasonable accommodations.") *Id*.

Another factor that plays into courts' decisions to discredit file reviews is when the file reviews themselves contain deficiencies. *See, e.g., Bennett v. Kemper Nat. Services, Inc.*, 514

F.3d 547, 554–55 (6th Cir. 2008) (discrediting file reviews that failed to explain a contrary finding by the Social Security Administration); *Evans v. UnumProvident Corp.*, 434 F.3d 866, 880 (6th Cir. 2006) ("Defendant's reliance solely on file reviews by its in-house physicians is questionable in light of the critical credibility determinations made in those file reviews, the factual inaccuracies contained therein regarding plaintiff's treatment history, and the fact that the file reviews categorically dismissed the reliable opinion of plaintiff's treating physician"); *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 297 (6th Cir. 2005) (discrediting file review that made critical credibility determinations and flew in the face of objective data in the record); *Javery*, 741 F.3d at 701-02 (discrediting file reviews in part due to problems with the reviews themselves); *Weidauer v. Broadspire Services, Inc.*, No. C–3–07–097, 2008 WL 4758691, at *11 (S.D. Ohio Oct. 27, 2008) (discrediting five peer reviews because they did not consider all of the evidence, or the combined impact of all of Weidauer's illnesses, and involved paper review for a psychiatric issue).

Finally, the Court is cognizant of, and considers, the various incentives at play. Just as "a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'" *Black & Decker*, 538 U.S. at 832.

Wagner and AUL both argue that the record evidence supports a judgment in their favor. Dr. Sullivan, Wagner's Primary Care Physician who has rendered a confusing (at best) panoply of opinions in this case, is a fruitful place to start. Wagner points to one subset of Dr. Sullivan's Attending Physician's Statements which describe him as completely unable to perform sedentary work and moderately deficient cognitively such that he is "able to engage in only limited stress situations and engage in limited interpersonal relations." The principal complaint in these

assessments is restlessness and constant need to readjust his position, as well as impairment to Wagner's "mental alertness" due to his narcotics prescriptions. AUL points to a second subset of Attending Physician's Statements by Dr. Sullivan which describe Wagner as unable to stand or walk but completely intact cognitively. These statements do not mention constant restlessness or the need to constantly shift positions.

The parties dispute the implications of a third set of Dr. Sullivan opinions, which suggests various middle grounds for Wagner's employability, like "light clerical work," "capable of clerical/administrative (sedentary) activity (60-70%)," "it is certainly possible he could work primarily with the keyboard and telephone," or that there is no medical reason he could not do part-time work at Home Depot. Dr. Sullivan has also mentioned balancing the need for pain medication with Wagner's aversion to felt side effects of fatigue and grogginess. Wagner emphasizes the grogginess, and AUL emphasizes the balance, as well as Wagner's participation in other activities that require him to be alert, like long-distance driving.

Wagner argues that a fourth set of Dr. Sullivan opinions works in his favor. In this set, Dr. Sullivan was asked about "sedentary" activities and was given a definition of "sedentary" that included a walking requirement. In response, Dr. Sullivan appears to take solace in a rigid interpretation of the given definition of "sedentary." He stated that Wagner could not do sedentary work, and circled problematic words in the definition, like "stand" or "walk." Neither side appears to know what to do with the fifth set of Dr. Sullivan's opinions, which suggest or state directly that he is unqualified to render an opinion on Wagner's employability and ask that Wagner be seen by a specialist in the area.

AUL argues that Dr. Sullivan became less credible after AUL first denied Wagner's benefits, because it was at that point that Dr. Sullivan's position inexplicably changed. Wagner

posits that Dr. Sullivan's opinion changed over time as he got to know Wagner better. The Court finds Dr. Sullivan's own statements as to his inability to determine Wagner's employability to be telling. These statements explain his erratic swings in opinion better than anything else. Although the Court notes that Dr. Sullivan may have felt some sympathy for his long-time patient in his post-denial-of-benefits opinions. *Black & Decker*, 538 U.S. at 832.

The record's contradictions do not end with Dr. Sullivan. Wagner seeks support in Ms. Guilbeau's September 2013 conclusion that, because he has frequent flashes of pain and involuntarily winces every few minutes, he is not capable of full-time employment. AUL contends that it continued Wagner's benefits in part because of Guilbeau's conclusion, but changed its mind with evidence collected over the following year.

Indeed, the next notable event is not until Ms. Berthiaume's file review in July 2014, which notes Wagner's participation in activities inconsistent with total disability, and which discounts Ms. Guilbeau's conclusions as "outside her area of expertise." While the parties argue over Ms. Berthiaume's possible bias and equivocal employability conclusion, as well as whether Ms. Berthiaume failed to consider Wagner's cognitive ability, Ms. Berthiaume's opinion is useful to the Court because she recommends observation of Wagner.

The August 2014 surveillance is telling, particularly in contrast with Ms. Guilbeau's observations the prior month of Wagner's entire body tensing up/twitching with pain every few minutes. In this surveillance video, Wagner is seen smiling, socializing with multiple people at the park, and taking his dog on an approximately two-hour walk. He is *not* seen twitching in pain, frequently adjusting his position, or exhibiting cognitive deficiencies requiring engagement only "in limited interpersonal relations." AUL points to this surveillance evidence as particularly damning, given the allegedly involuntary nature of Wagner's frequent pain flashes and twitches.

Wagner does not address his lack of twitching or readjusting his position in the video, but comes back with two retorts: first, he was surveilled for only a few hours of an attempted three days;[2] and second, walking his dog is different in quality from working at a desk in a job requiring intellectual acuity.

While Wagner was surveilled only for a few hours (the fact that he was traveling for one of the days cuts against Wagner and the fact that he was at home for the other cuts for him), the Court still finds the surveillance to be illuminating. Wagner's primary reason that he cannot perform his job is that he is allegedly very restless, in pain (including frequent ice-pick-like stabbing), and he requires constant body shifting. He also claims "moderate" narcotics-induced cognitive impairment that makes him groggy and tired, although he does not directly link this grogginess to an inability to do the thinking required for his job. Instead, he alleges that AUL must prove that he *can* do the thinking required for his job. This is incorrect, because a plaintiff bears the burden of proof in an ERISA benefits case. *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n. 4 (6th Cir. 2006). In any event, the surveillance video shows Wagner alert and at ease, and not restless, exhibiting any twitches or winces of pain, or shifting his body. It shows him driving competently and sitting in his wheelchair without apparent complaint for two hours straight.

This case is not like *Hunter v. Life Ins. Co. of N. Am.*, 437 F. App'x 372, 378-79 (6th Cir. 2011), where discrepancies between "stated and observed" functionalities are relatively minor. Here, the discrepancies are wide: Wagner stated that he has to constantly shift position; the surveillance showed that, for hours, he did not do so. He stated that he has pain twitches frequently; in the video he had none. He stated that he has cognitive deficiencies; he was seen socializing with many people in the park. In *Hunter*, the claimant, who claimed physical

_____
[2] He was out of town traveling for one of these days.

infirmities disabling her from her job, was only seen in tiny bursts (at the gas station or walking from doctor's office to car). Wagner was seen continuously for multiple hours. His constant restlessness (if not his grogginess) should have been abundantly clear on the video. It was not.

The battle of the experts continues. Dr. Hale, a neurologist commissioned after the denial of Wagner's benefits, submitted three statements. Wagner points to one such statement, which indicates that Wagner could not perform any work in a sedentary capacity, and that he suffered from moderate cognitive impairments. AUL points to two more—one indicates that Wagner cannot stand or ambulate, but he has no mental or nervous impairments.[3] The second, through an "X" next to "Yes," indicates that Wagner can perform full-time sedentary work. Wagner argues, pointing to a letter from his attorney, that this latter "X" was made by Dr. Hale in error.

Dr. Keomahathai, a pain specialist, supports Wagner with a statement that he has moderate impairment to his cognition, that he is restless and requires frequent position-shifting, "with some impairment to cognizance due to chronic narcotic use for chronic pain," and that he cannot work in any capacity. And Dr. Growick, a vocational expert hired by Wagner who conducted his own file review (albeit of only records that support Wagner's disability), also found him to be unable to work in any capacity.

As to Dr. Growick, the Court appreciates that his review of certain evidence leads to a certain conclusion. This report is of little value to the Court, especially because Dr. Growick did not observe Wagner and did not review all of the relevant medical evidence. The Court considers the conflicting opinions of Dr. Hale (even omitting the one claimed to be in error) and Dr. Keomahathai's observation that Wagner was restless and shifted position frequently. Both

---

[3] In this statement, the "sedentary" physical ability box is marked with an "X", although the form asks for a number of hours Wagner can perform that activity.

doctors noted some cognitive impairment from narcotics use, but neither described exactly what functions were impaired. The Court also considers the ample evidence to the contrary.

On the other side of the coin are Dr. Russell, a DRMS doctor in Occupational Medicine who completed two reviews of Wagner's medical records, Ms. Marques, who made an "own occupation assessment," and Mr. Wagner's self-reported activities. Dr. Russell analyzed evidence both supporting and discrediting Wagner's claim, and ultimately concluded that Wagner "was not precluded from sedentary work in a wheelchair." Dr. Russell placed great weight on Wagner's self-reported activities and the surveillance video. He noted that Wagner's complaint that pain precludes him from his sedentary occupation is inconsistent with "a person who lives alone, drives extensive distances, volunteers, fishes, and pushes his wheelchair on walks with his dog." He also contrasted Wagner's claimed cognitive deficits with his ability to take his medication, pay his bills (and the Court notes that Wagner also helped his parents with their bills), and drive without getting lost. He noted that no doctor ever *described* Wagner's alleged cognitive deficits or actually tested them. And he cited Dr. Keomahathai's note that Wagner had no "untoward side effect of his meds." He noted that Wagner's appeal letters were "cogent, informative, and well written."

Wagner asserts several arguments pertinent to Dr. Russell and his analysis. First, he argues that Dr. Russell is biased in favor of his employer DRMS. The Court, however, finds Dr. Russell's analysis to be sound. *See Rothe v. Duke Energy Long Term Disability Plan*, No. 1:15-cv-211, 2016 U.S. Dist. LEXIS 135753, *20-*21 (S.D. Ohio 2016) ("The Court remains aware that Liberty Life was operating under a conflict because it determines eligibility for benefits and then is also responsible for paying those benefits. However, there is no evidence in this record that the conflict in any way influenced the plan administrator's decision.").

Next, Wagner argues that Russell misstates the record by saying "[t]here is no evidence in the file that the insured has cognitive deficits from his medications." He argues that AUL did not consider his cognitive impairments, or even the intellectual or social aspects of his "own occupation." And he goes one step further to argue that there is no evidence in the record to contradict Wagner's impairment from his medications.

As for the alleged misstatement of the record, this statement relates back to a previous assessment by Dr. Russell, which is presented to Wagner in the June 10, 2015 letter denying his appeal:

> there is no mention of you needing help taking your medications, remembering to pay bills, losing your way while driving, or possessing less than appropriate executive function. Your appeal letters were noted to be cogent, informative, and well written. On observation, you appeared to be conversing with multiple persons at the park, you did not exhibit pain behavior, shifting positions, and you were able to drive yourself, eat lunch and take your dog for a long walk.

In the above, as well as in other statements, Dr. Russell does not ignore, but rather addresses Wagner's alleged cognitive deficiencies, contrasting them with his other activities. In addition, the record does contain evidence contrary to Wagner's claimed cognitive deficiencies. Dr. Sullivan and Dr. Hale, in certain assessments, found that Wagner suffered from no cognitive limitations. In a job requiring mental acuity, "no cognitive limitations" suggests such acuity. The surveillance video also suggests cognitive acuity and social function, as do Wagner's stated activities of long-distance driving, bill-paying, completing his own chores, etc.

Relatedly, Wagner argues that the fact that he can perform some of the activities of daily living says nothing about his ability to perform the essential functions of his occupation. *McDonald v. Western-Southern Life Ins. Co*., No. C2–98–414, 2001 WL 1678793, at *11 (S.D. Ohio Dec. 14, 2001) and *Demer v. IBM Corporation LTD Plan*, 835 F.3d 893, 905 (9th Cir. 2016) support this assertion, but are distinguishable. In *McDonald*, the court concluded that the

decision to terminate benefits was arbitrary and capricious. 2001 WL 1678793, at *11. The defendant had relied in part on claimant's bridge playing and vacationing as inconsistent with his claimed disability of severe depression. *Id.* at 9. This decision was made in the face of unanimous evidence from claimant's treating physicians that he was disabled by severe depression, as well as evidence from his bridge coach that he was a poor player. *Id.* at *9-*11. Here, the evidence from Wagner's treating physicians is far from unanimous, and there is no evidence that he is "poor" at any of his daily activities, which include cognitively-taxing tasks such as long-distance driving and socializing. In *Demer*, the claimant claimed issues with concentration, memory, and confusion due to his medications. 835 F.3d at 895. These issues clearly impaired plaintiff from a job requiring high mental functioning. Grogginess, less so. And if grogginess impaired Wagner's job function, it should also impair his daily activities, like long-distance driving and bill-paying.

Finally, Wagner argues that Dr. Russell questioned Wagner's physicians and made a credibility determination about Wagner, which should cause the Court to discredit Dr. Russell's file review. While the failure to conduct a physical examination is "especially troubling" when a plan's advisors make credibility determinations and second-guess treating physicians, *Shaw* 795 F.3d at 550 (internal quotations omitted), the Court may credit file reviews that point out inconsistencies within the record. *Nichols*, 192 F. App'x at 504. Dr. Russell noted the inconsistencies among Wagner's physicians, and even in the reports of a single physician. While he noted that Wagner's body adjustment "appears to be a choice," this is not a credibility determination so much as a comparison with Wagner's demeanor in the surveillance video, where he was seen *not* adjusting his body. And Dr. Russell's review of the surveillance video is more than the traditional paper file-review—Dr. Russell *did* have a chance to observe Mr.

Wagner through the surveillance video, albeit not in the clinical environment. Moreover, Dr. Russell's report did not fail to examine and explain evidence contrary to his opinion, ignore part of the record, or contain any other deficiencies that would require the Court to disregard it. *See, e.g., Bennett*, 514 F.3d at 554-55; *Evans*, 434 F.3d at 880; *Calvert*, 409 F.3d at 297; *Javery*, 741 F.3d at 701-02; *Weidauer*, 2008 WL 4758691, at *11. Therefore, the Court declines to disregard Dr. Russell's file review, and finds that it weighs in favor of AUL for the physical and cognitive aspects of Wagner's employability.

Turning to Ms. Marques' "own occupation assessment," Wagner is correct that this assessment focused on the physical demands of his job. She compared Wagner's history, medical treatment, and statements from Dr. Sullivan, with the physical demands of Wagner's prior job, and concluded that "[t]he sedentary physical demands of the combined Systems Analyst and Service Clerk occupation are consistent with Mr. Wagner's full time sedentary physical capacities, affording a couple of minutes (mini breaks) every 30 minutes." Because she did not compare the cognitive aspects of Wagner's job to his abilities, her opinion deserves less weight.

Finally, the Court considers the fact that AUL awarded Wagner benefits for more than two years, and the fact that Wagner (to the Court's knowledge) continues to receive SSD benefits. Wagner advocates that this previous award of benefits suggests their continuation. *Boyd v. American Elec. Power System Long-Term Disability Plan*, No. 2:06-CV-161, 2007 WL 2778667, at *7 (S.D. Ohio Sept. 21, 2007) ("The fact that defendant's decision to terminate benefits was not based on new significant evidence or evidence of improvement since the prior determination of disability weighs against the propriety of defendant's decision to terminate plaintiff's LTD benefits.). However, in contrast with *Boyd*, AUL awarded benefits until it

acquired new evidence. Indeed, the surveillance video appeared to kick off AUL's investigation in earnest, which led AUL to analyze, rather than simply record, Wagner's daily activities. The fact that AUL awarded Wagner benefits in the past does not weigh in Wagner's favor in this case.

As for Wagner's Social Security benefits, the parties do not point the Court to any assessments by the Social Security Administration *after* the surveillance video and other information analyzed by AUL in changing its decision. While "a disability determination by the Social Security Administration is relevant in an action to determine the arbitrariness of a decision to terminate benefits under an ERISA plan," in this case these decisions were not contemporaneous. *Glenn v. MetLife*, 461 F.3d 660, 667 (6th Cir. 2006).

Based on all of the above, the Court finds that Wagner has failed to meet his burden to show that he is disabled from his own occupation.

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Wagner's motion for judgment on the administrative record (Doc. 21) and **GRANTS** AUL's motion for judgment on the administrative record. (Doc. 24.)

**IT IS SO ORDERED.**


  /s/ Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**DATED: September 15, 2017**